# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### NEW ALBANY DIVISION

| | |
|---|---|
| THOMAS A. TURNER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. 4:20-cv-00152-TWP-DML |
| | ) |
| BRENT MILLER Washington County Sheriff, | ) |
| JOSEPH KELTNER Washington County Sheriff | ) |
| Deputy in his official and individual capacities, | ) |
| MATTHEW HEIN Washington County Sheriff | ) |
| Deputy in his official and individual capacities, | ) |
| TROY HILDRETH Washington County Sheriff | ) |
| Deputy in his official and individual capacities, | ) |
| CHERYL BAKER, and ANDREAS BAKER, | ) |
| | ) |
| Defendants. | ) |

## ENTRY ON DEFENDANTS' MOTIONS TO DISMISS

This matter is before the Court on the defendants Motions to Dismiss. Defendants

Washington County Sheriff Brent Miller ("Sheriff Miller"), Washington County Sheriff Deputies

Joseph Keltner ("Captain Keltner"), Matthew Hein ("Deputy Hein"), and Tory[1] Hildreth ("Deputy

Hildreth") (collectively, the "County Defendants"), (Filing No. 16) seek dismissal pursuant to

Federal Rule of Civil Procedure 12(b)(6).  Defendants Andreas Baker ("Andy") and Cheryl Baker

("Cheryl") (collectively, the "Bakers") also filed a Motion to Dismiss (Filing No. 14), however,

their Motion is resolved pursuant to Federal Rule of Civil Procedure 56.[2]  Plaintiff Thomas A.

Turner ("Turner") initiated this action against the County Defendants alleging violations of his

civil rights under 42 U.S.C. § 1983 and state law claims against the Bakers for defamation and

---

[1] This Defendant was incorrectly referred to in the Complaint as "Troy Hildreth" (*see*, Filing No. 17, fn1).

[2] Though the Bakers style their motion as one to dismiss, it will be treated as a motion for summary judgment because a motion to dismiss under the anti-SLAPP Act is treated as a motion for summary judgment. *See* Ind. Code § 34-7-7-9; *infra* Section II.B.1.

libel, malicious prosecution, and intentional infliction of emotional distress (*see* Filing No. 1 at 14–16).  For the following reasons, the Court **grants** the County Defendants' Motion (Filing No. 16) and **denies** the Bakers' Motion (Filing No. 14).

## I.  BACKGROUND

On July 27, 2018, Turner was in the backyard of his residence test firing firearms that he had recently purchased.  (Filing No. 1 at 4–5.)  During a two-and-a-half-hour span—from roughly 2:30 p.m. to approximately 5:00 p.m.—he fired his firearms ten times while pointing the weapons down, and a couple feet away from the front of his body, and firing single rounds periodically into the ground. *Id.* at 5.  While Turner was firing his firearms, his neighbor Cheryl, arrived home from work and went to retrieve her mail. *Id.* at 6.  As she neared her mailbox, she heard four or five gunshots coming from Turner's property, and, as she walked back to her house, she heard two or three more gunshots. *Id.*  After entering her home, Cheryl observed Turner in his backyard. *Id.* At approximately 4:20 p.m., Cheryl's husband Andy, arrived home from work, hearing one gunshot as he turned his truck into his driveway and another as he drove toward his residence. *Id.* at 7.  The Bakers, however, never saw Turner shoot the weapons and never found any damage on their property. *Id.*  Approximately ten minutes after Andy arrived home, Cheryl contacted the Washington County Sheriff's Department ("Sheriff's Department") to report "that Turner was shooting a handgun into the air in the direction of other residences." *Id.*

Deputy Hein was immediately dispatched to the scene, where Cheryl—under penalty of perjury—stated that she saw "Turner aim a firearm in her direction" two or three times and "discharge a firearm in a trajectory over her head" another two or three times. *Id.* at 8.  Andy—also under penalty of perjury—affirmed to Deputy Hein that on that day he saw "Turner aim a firearm in his direction while he was in his truck attempting to turn into his driveway," "discharge

a firearm in a trajectory over the truck he was driving," "aim a firearm in his direction a second time while his truck had entered onto the driveway," "discharge a firearm a second time in a trajectory over the truck he was driving," and also that he saw Turner "aim a firearm in his direction" and "discharge a firearm in a trajectory over his person" on three prior occasions. *Id.* at 8–9.

Deputy Hein concluded his interviews with the Bakers, and Deputy Hildreth arrived on the scene. After being apprised of the situation, the two deputies headed to Turner's home.  *Id.* at 9. Turner denied the accusations, explaining "that he had been test firing firearms he had recently purchased on his residential property toward the north and back of his home," each time aiming "the firearm down before discharging it directly into the ground in close proximity of his person." *Id.*  After showing the deputies "the location on his property where he had been test firing his firearms," Turner stated that he neither pointed nor discharged a firearm "up and into the sky" or toward the Bakers' or any neighbor's residence.  *Id.* at 9–10.  All of Turner's test firings were captured on video by his come security system.  *Id.* at 5. Although Turner offered to show the deputies security footage from "his security camera surveillance system [that] would substantiate his statements to them," the deputies "elected not to view and/or obtain a copy" of the recording. *Id.* at 10.  The deputies "did not place Turner under arrest" and left the scene.  *Id.* at 11.

Following the interview at his home, Turner  "reported to the Washington County Sheriff's Department to better understand what he had done to warrant his investigation for test firing his firearms on his property on July 27, 2018."  *Id.*  Upon arrival, "Turner met with Deputy Hildreth and Captain Keltner to discuss why Deputy Hein had accused him of engaging in criminal recklessness," again informing them that "that he did not point, aim and/or discharge his firearm in the direction of a person and/or a residential property" and "that he had security surveillance

footage that" could back him up.  *Id.* Deputy Hein then "entered the conversation," informing Captain Keltner that the Bakers had accused Turner of pointing, aiming, and discharging "a firearm in their direction on numerous occasions" that day.  *Id.* at 11–12.  At that time, Deputy Hein asserted "that Turner's arrest for criminal recklessness was warranted based upon the statements he received from Cheryl and Andy." *Id.* at 12.  Then, "with Captain Keltner's consent and authorization," Deputy Hein arrested Turner.  *Id.*  A few days later, the Bakers submitted a Victim Impact Statement to the Washington County Prosecutor's Office, stating, among other things, that Turner frequently shot guns over their heads.  *Id.* at 12–13.  Turner was prosecuted wrongfully for the events of July 27, 2018.  *Id.* at 13.

On July 1, 2020, Turner filed a Complaint in this Court alleging that the County Defendants violated his rights under 42 U.S.C. § 1983, *see id.* at 14–15, and that the Bakers were liable for defamation and libel *per se*, malicious prosecution, and intentional infliction of emotional distress, *see id.* at 15–16.

## II.   <u>LEGAL STANDARDS</u>

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to move to dismiss a complaint that has failed to "state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When deciding a motion to dismiss under Rule 12(b)(6), the court accepts as true all factual allegations in the complaint and draws all inferences in favor of the plaintiff.  *Bielanski*, 550 F.3d at 633. However, courts "are not obliged to accept as true legal conclusions or unsupported conclusions of fact."  *Hickey v. O'Bannon*, 287 F.3d 656, 658 (7th Cir. 2002).

The complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  In *Bell Atlantic Corp. v. Twombly*, the United States Supreme Court explained that the complaint must allege facts that are "enough to raise a

right to relief above the speculative level." 550 U.S. 544, 555 (2007).  Although "detailed factual allegations" are not required, mere "labels," "conclusions," or "formulaic recitation[s] of the elements of a cause of action" are insufficient.  *Id.*; *see also Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009) ("it is not enough to give a threadbare recitation of the elements of a claim without factual support").  The allegations must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555.  Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citation and quotation marks omitted). To be facially plausible, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556).

Moreover, Federal Rule of Civil Procedure 12(d) provides that

[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.  All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

The Seventh Circuit has explained that,

[i]n response to an ordinary 12(b)(6) motion, a court simply examines the allegations in the complaint to determine whether they pass muster. If a district court considers matters outside the pleadings, our procedural rules require that the motion shall be treated as one for summary judgment under [Rule] 56. Under this converted motion, all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56. The consideration of outside matter without converting the motion may result in reversible error.

*GE Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997) (internal citations and quotation marks omitted).

With that in mind, Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). However, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of a claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citation and internal quotations omitted). Finally, "neither the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and internal quotations omitted).

## III.   DISCUSSION

Turner makes the following claims in his Complaint: Count I: 42 U.S.C. § 1983 against Captain Keltner, Deputy Hein and Deputy Hildreth); Count II: 42 U.S.C. § 1983 against the Sheriff; Count III: Defamation and Libel Per Se against Cheryl and Andy; Count IV: Malicious Prosecution against Cheryl and Andy; and, Count V: Intentional Infliction of Emotional Distress

against Cheryl and Andy. Both sets of Defendants have separately moved for the Court to dismiss the claims pending against them. The Court will discuss each Motion in turn.

### A.   The County Defendants' Motion to Dismiss

Turner brings two 42 U.S.C § 1983 claims against the County Defendants: a § 1983 against Captain Keltner and Deputies Hein and Hildreth for direct "violations of his constitutional rights under color of law" and a claim under against Sheriff Miller for developing and maintaining "policies, customs and training protocols exhibiting deliberate indifference to the constitutional rights of persons in Washington County, Indiana, which caused the violations of Turner's rights." (Filing No. 1 at 14.)  The County Defendants seek dismissal of these claims.

### 1.   Additional Background

In response to this Motion to Dismiss, Turner attached, and relies upon facts set forth in a declaration and supporting exhibits (*see* Filing No. 27-1).  In addition to detailing the events above, the declaration discusses at length a history of property disputes between him, the Bakers, and other neighbors; Donald Bush ("Don") and Sonya Bush (the "Bushes").  *Id.* at 2–4.  Turner owns property on which sits a public-access road ("Woodland Drive") that the Bakers use that road to reach their property.  *Id.* at 2.  This property also abuts land owned by the Bushes.  *Id.* at 3–4.  In 2009, Turner and the Bushes began quarrelling after Don developed some portions of Turner's property without his knowledge or consent.  *Id.* at 4.  When Turner spoke with Don about the matter, Don acknowledged that he did not know where the precise boundary line was located and thought that he had probably exceeded it by "four or five feet."  *Id.* at 5.  After Don refused to remediate his work, Turner reported "the unauthorized encroachment" to the Sheriff's Department twice.  *Id.*  After the first report in the fall of 2009, Deputy Chris Strange ("Deputy Strange") agreed to tell the Bushes that they needed to undo their work.  *Id.*  Soon thereafter, Don called

Turner, asking for him to locate and mark the property line. *Id.* But after Turner informed Don that it was his responsibility to locate and mark the property line and restore the property to its previous condition, the Bushes failed to restore the property. *Id.* In the summer of 2010, Turner returned to the Sheriff's Department. *Id.* Despite being told by then-Sheriff Claude Combs that this was a civil matter outside the scope of his department's duty, then-Sheriff Combs sent Deputy Rick Stewart to tell the Bushes to remediate the land. *Id.* at 5–6.

By September 2013, the Bushes still had not restored the property, so Turner sued them to address the matter. *Id.* at 6. This suit became a "focal point of discussion" in the Salem, Indiana community, specifically that Turner owned the land on which Woodland Drive sat. *Id.* Rumors swirled that Turner would "restrict access to and ultimately remove Woodland Drive from" his property. *Id.* By November 2013, Turner and the Bushes had settled the matter—but when Turner was leaving the courthouse, Andy accosted Turner and his wife "in the parking lot during which he threatened to sue us to prevent me from restricting access to Woodland Drive." *Id.* In the spring of 2014, Andy "confronted" Turner while Turner mowed the strip of grass separating the Bakers' property from Woodland Drive, telling him to "get off his property." *Id.* at 7. Turner responded that "if you own something, you should take care of it" and resumed mowing the grass. *Id.* Later, while Turner was disposing garbage at the landfill where Andy worked, Andy confronted him again "in a visibly agitated manner and combative tone," accusing Turner of "trespassing" on his land and not "own[ing]" Woodland Drive. *Id.* Several more times, the men went back and forth about the disputed land's ownership, culminating in, after Turner refused a "five (5) gallon bucket of cucumbers" from Andy, Andy telling Turner in August 2015 that he was going to "take" his property and that "they" were going to "take" the part of Turner's property that was between Woodland Drive and the Bakers' land. *Id.* at 7–8.

Approximately a week later, Turner noticed on the "Washington County MAP and Property Assessment Card" web portal that his property's "boundary lines had been replatted in a manner that removed the portion of [his land] separating Woodland Drive from" the Bakers. *Id.* at 8. This was just "as Andy said would be done." *Id.* Because he was shocked by this development, Turner hired an attorney "to address the unauthorized, clandestine and unilateral replatting of the Turner Parcel." *Id.* This attorney presented Turner's "complaint to Washington County Attorney Thomas E. Scifres," requesting for the property lines to revert to their prior locations. *Id.* at 8–9. Turner later learned "that Andy, Scifres[,] and Washington County Surveyor Jeff Souder … were involved in the unauthorized replatting of the Turner Parcel." *Id.* at 9. Ultimately, the boundary lines were restored "to the manner depicted by the Turner Parcel deeds," and Turner filed a formal complaint with the Federal Bureau of Investigations ("FBI") over Andy, Scifres, and Souder's involvement in the replatting. *Id.* Sometime thereafter, Turner "learned that Scifres and Souder were no longer employed by Washington County." *Id.*

After all this, the feuding between Andy and Turner continued. Twice Andy walked down Woodland Drive and, when he encountered Turner, threatened that he would "blow [his] house up." *Id.* at 9–10. Andy also told Turner three times that "he had a gun that could shoot through a house." On another occasion, Andy "walked out of his house and stood in his driveway holding a rifle with the butt of the firearm on his hip and watched [Turner] as [he] was mowing the section of the Turner Parcel that separates the Baker Parcel from Woodland Drive." *Id.* Turner promptly reported this incident to the Sheriff's Department. *Id.* at 10. Later, in June 2016, "Andy exited his home, walked out onto Woodland Drive toward [Turner] and began taking pictures of [him] as [he] was actively mowing the Turner Parcel," ostensibly "to show that [Turner] was working

openly to adversely possess the land upon which Woodland Drive is built so that [he] could restrict and prohibit public access to Woodland Drive." *Id.*

Turner reported all this behavior to a Sheriff's deputy, who instructed Turner "to write down [his] troubles concerning Andy for purposes of securing a restraining order against Andy." *Id.* The deputy also told Turner that once he "completed the restraining order paperwork," the deputy "would personally serve the restraining order upon Andy." *Id.* At a hearing later that month, the judge denied Turner's request for a restraining order, explaining that "to resolve our boundary line dispute properly, we need to sue each other over the Turner Parcel and Baker Parcel boundary lines." *Id.* at 11. Because Turner "was supporting two (2) of [his] sons while they were enrolled in college," he decided not to file suit concerning the boundary lines. *Id.*

A few months later, in October 2016, "the new Washington County Attorney Dustin L. Howard ('Howard') invited [Turner] to his office to discuss Andy and [Turner's] disputes concerning the Turner Parcel and Baker Parcel boundary lines." *Id.* Howard informed Turner that he told Andy that Turner owned the property between the Baker Parcel and Woodland Drive, and that, upon hearing this, Andy "became incensed." *Id.* Because Washington County had an interest in resolving the land dispute within its boundaries, Howard told Turner that "he would serve as an impartial party in an attempt to reach an amicable resolution of this matter." *Id.* Accepting this proposal, Turner offered an agreement where "Andy would acknowledge my ownership of the portion of the Turner Parcel separating the Baker Parcel and Woodland Drive; and that I would permit Andy to maintain this portion of the Turner Parcel." *Id.* Andy, however, "rejected [Turner's] settlement proposal" and "proposed a counter-proposal that he would purchase the section of the Turner Parcel separating the Baker Parcel from Woodland Drive from [Turner] for the amount of Three Thousand Dollars ($3,000.00). In addition, Baker would also pay all fees

associated with the transfer of [Turner's] property." *Id.* at 12.  Turner, in turn, rejected this offer. *Id.*

Howard then asked Turner if he "would be willing to allow Washington County to replat the Turner Parcel by moving the boundary line that abuts up against the Baker Parcel north to the center of Woodland Drive." *Id.*  Turner rejected this also. *Id.*  But when Howard "offered to work with Washington County to structure an option whereby Washington County would 'trade' [Turner] certain tax-sale property in exchange for the entire section of the Turner Parcel upon which Woodland Drive sits," Turner expressed interest. *Id.*  Turner, however, has "not heard anything back from Howard or Washington County about this arrangement." *Id.*

      2.    **Analysis**

      a.    **Probable Cause**

The County Defendants first argue that even when taking the facts set out in Turner's Complaint as true, "liability under Section 1983" is barred because probable cause existed for Turner's arrest.  ([Filing No. 17 at 4](#).)  Turner "informed the responding Washington County Sheriff's Deputies that he had fired his gun multiple times on the afternoon," but avowed "that he did not aim the firearm in the Bakers' direction." *Id.* at 5. The Bakers, however, disputed this assertion, "claiming [Turner] aimed the firearm in their direction and discharged the firearm over Cheryl's head and over Andy's truck." *Id.*  Though Turner seemingly maintains that the "County Defendants had a duty to investigate the Bakers' allegations by reviewing the [Turner]'s home surveillance footage after the complaints were made," *id.* at 5, "[l]aw enforcement officers 'have no duty to investigate extenuating circumstances or search for exculpatory evidence once probable cause has been established via the accusation of a credible witness,'" *id.* at 6 (citing *Burritt v. Ditlefsen*, 807 F.3d 239, 250–51 (7th Cir. 2015)).  Dispositive to the claim, the County Defendants

contend, "[t]he witness statements attributed to the Bakers in the Complaint established probable cause for the Plaintiff's arrest." *Id.*

In response, Turner argues that "there was no probable cause to arrest" him (Filing No. 29 at 15). Instead, the

> County Defendants' collective knowledge cast doubt on the truthfulness of the Bakers' eyewitness statements sufficient to lead a reasonable officer to be suspicious and undertake further investigations to established whether Turner actually aimed and/or pointed and/or discharged his pistols directly at, near and/or in the general vicinity of the Bakers' and the Baker Parcel.

*Id.* at 15–16. In support of his argument, Turner contends the collective knowledge of the County Defendants suggested that the Bakers were untruthful when their "long standing animosity toward Turner concerning the Baker Parcel and Turner Parcel boundary lines was well-known throughout the Salem community." *Id.* at 18. In fact, "Andy's illogical malice toward Turner" as well as his "public discontent for and overt retribution against Turner prompted Turner to request the intervention of the Washington County Sheriff Department on numerous occasions." *Id.* These circumstances informed the County Defendants of "the Bakers' antagonism of Turner," specifically when Turner previously contacted the Sheriff's Department to report that Andy had been:

1.  threatening him and his family with serious body injury and death;

2.  brandishing a firearm to instill upon Turner his intent to cause him and his family serious bodily injury and death;

3.  threatening and intimidating him because of his erroneous belief that the Bakers owned the portion of the Turner Parcel separating the Baker Parcel from Woodland Drive;

4.  making false statements of fact publicly concerning Turner trespassing, attempting to adversely possess the Bakers' property through the maintenance of the Turner Parcel, and restricting public access to Woodland Drive; and

5.  engaging in such insidious behavior to force Turner and his family to move off of and ultimately sell the Turner Parcel.

12

*Id.* at 18–19.  Instead of thoroughly investigating these claims, Turner asserts that a Sheriff's Department deputy merely told him to obtain a protective order against "his protagonist," which the Sheriff's Department later served upon Andy.  *Id.* at 19.  These events, Turner urges, should have made the County Defendants "suspicious of the veracity of Cheryl and Andy's eyewitness accounts."  *Id.*

Turner contends the County Defendants should have known about the existing animosity between the parties when Andy had "recruited Washington County municipal employees—Scifres and Souder—to steal from Turner the portion of the Turner Parcel upon which Woodland Drive was built," resulting in FBI involvement and "Washington County severing its employment relationships with Scifres and Sounder."  *Id.*  Likewise, Turner argues the County Defendants should have known about the simmering feud after Washington County "attempted unsuccessfully to mediate Andy's hostilities toward Turner caused by Andy's irrational belief that Turner was attempting to adversely possess his property" after the "protective order against Andy failed."  *Id.* at 19–20.

Finally, Turner notes that, "[i]nterestingly, Deputy Hildreth . . . is silent on whether he believed probable cause existed," which leads to a reasonable inference that he "did not find that the Bakers' complaints reasonably supported a belief that Turner had committed a crime, and the description of the events that Cheryl and Andy gave him and Deputy Hein did not satisfy the elements of criminal recklessness with a firearm."  *Id.* at 20.  Instead, "it seems Deputy Hein arrested Turner in retaliation for complaining about the legitimacy of his professional conduct" after Turner complained "about Deputy Hein and Deputy Hildreth's performance of their law enforcement duties."  *Id.*

In reply, the County Defendants argue that the "collective knowledge doctrine" relied upon by Turner "has no application to the facts of this case."   (Filing No. 34 at 2.)   In fact, the County Defendants note that Turner has neither alleged that he "informed the responding officers of these alleged 'hostilities' on the day of his arrest" nor has he alleged that the County Defendants "were involved in any prior incidents between" the parties.   *Id.*   Specifically, although Turner notes that a Sheriff's Department deputy told him to obtain a restraining order against Andy two years before the events in this case, he "has not alleged this deputy was involved in the arrest at issue in this case."   *Id.* at 2–3.   Turner's attempt to insert knowledge onto the County Defendants not involved in any prior happenings between the parties faulters when they were not "'jointly involved'" in any of the earlier events.   *Id.* at 3 (quoting *United States v. Whitfield*, 634 F.3d 741, 745 (3rd Cir. 2010)) (emphasis omitted).   Moreover, "conclusory allegations"—such as: "[i]t is more than reasonable to assume" that the County Defendants knew about the Scifres and Sounder saga or that the "long-standing animosity" between the parties was "well-known throughout" the community—"are insufficient to defeat a motion to dismiss." *Id.* at 3–4 (underlining County Defendants') (emphasis in original).   Finally, even if the County Defendants knew about antecedent "hostility" between the parties, "this fact alone would not invalidate the Bakers' report to law enforcement."   *Id.* at 3 n.1.

"The existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer" for a claim like Turner's.   *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013).   "Probable cause exists if 'at the time of the arrest, the facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'"   *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012)

(quoting *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009)). Under this analysis, "[o]nce a reasonably credible witness informs an officer that a suspect has committed a crime, the police have probable cause to arrest the suspect." *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006) (citations omitted). The existence of probable cause does not depend on the truthfulness of the witness's complaint: "So long as an officer reasonably believes the putative victim of or eyewitness to a crime is telling the truth, he may rely on the information provided to him by such persons in deciding to make an arrest, without having to conduct an independent investigation into their accounts." *Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013) (citations omitted). Such is the case "even when the suspect denies an accusation of wrongdoing." *Id.* (citing *Reynolds v. Jamison*, 488 F.3d 756, 762 (7th Cir. 2007)). In fact, an officer, when presented with a credible report of criminal behavior, is "under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003).

The day that Turner was arrested, the Bakers—both under penalty of perjury—informed Deputy Hein that Turner had pointed, aimed, and fired his guns toward them two or three times earlier that afternoon. Turner does not identify any evidence showing that Deputy Hein, or any of the deputies for that matter, had reason to question the veracity of these sworn claims. *See Mustafa*, 442 F.3d at 548. And no constitutional provision compelled the deputies to conduct further investigation (such as viewing video proffered by a suspect protesting his innocence), even after Turner denied wrongdoing. *See Williamson*, 714 F.3d at 441. That Turner had experienced prior animosity with the Bakers is not a relevant factor when determining whether the County Defendants had probable cause to arrest Turner—what matters are "the facts and circumstances" they knew at the time that would make them think Turner had committed a crime. *See Thayer*,

705 F.3d at 246. As Turner himself notes, "[t]he complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest." (Filing No. 29 at 17 (citations omitted).)

Turner's contention that the Bakers long standing animosity toward Turner "was well-known throughout the Salem community" would discredit the Bakers' sworn statements to the deputies—also misses the mark. (Filing No. 29 at 18.) Neither of these contentions point to these particular deputies having any of the "collective knowledge" as contemplated by the doctrine Turner invokes. *Id.* at 17 (citing *United States v. Lee*, 962 F.2d 430, 435 (5th Cir. 1992); *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989); *United States v. Ledford*, 218 F.3d 684, 689 (7th Cir. 2000); *United States v. Butler*, 74 F.3d 916, 921 (9th Cir. 1996)). This doctrine requires, as these cited cases demonstrate, that the evidence be "known by other officers *involved in the investigation*." *Lee*, 962 F.2d at 436 (emphasis added); *see also Collins*, 892 F.2d at 495 (applying the doctrine when information was "compiled from different phases of an investigation"); *Ledford*, 218 F.3d at 689 ("Because *the search was a joint endeavor*, the court may properly consider what . . . other officers knew.") (emphasis added); *Butler*, 74 F.3d at 921 ("Probable cause can also be demonstrated through the collective knowledge of police officers *involved in an investigation*.") (emphasis added). Setting aside the fact that the doctrine was used in all these cases to establish— not annul—probable cause with supplemental "facts and circumstances," Turner has not alleged that any deputy involved in his arrest knew about his existing dispute with the Bakers. This pleading deficiency is fatal to the doctrine's applicability in Turner's case.

For the preceding reasons, the Court **grants** the County Defendants' Motion to Dismiss on Turner's § 1983 claim against the County Defendants because the deputies had probable cause to arrest Turner after the Bakers attested that he had shot at them earlier in the day.

b.     **Qualified Immunity**

The County Defendants argue that even if they "did not have probable cause to arrest" Turner, "they are entitled to qualified immunity because reasonable officers in their situation could have reasonably believed probable cause for the Plaintiff's arrest existed." (Filing No. 17 at 8.) Qualified immunity shields "officers from suit for damages if a reasonable officer could have believed the arrest to be lawful, in light of clearly established law and the information the arresting officers possessed." *Id.* at 7 (citing *Keaton v. Hannum*, No. 1:12-cv-00641-SEB-MJD, 2014 U.S. Dist. LEXIS 31405, at *24 (S.D. Ind. Mar. 11, 2014)). The Seventh Circuit has noted the qualified immunity, "'provides shelter for officers who have arguable probable cause to arrest—*i.e.*, those officers that reasonably but mistakenly believe they have probable cause.'" *Id.* (citing *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013) (citation omitted)).  The circumstances here are compelling: the County Defendants were informed that Turner "fired his gun several times on property immediately adjacent to the Bakers' property on the date in question, and he admitted as much to the [ ] County Defendants when they responded to Cheryl's call." *Id.* at 8. Moreover, "both Cheryl and Andy reported [Turner] had 'aim[ed] a firearm' in their direction," "Cheryl allegedly reported that she 'observed [Turner] discharge a firearm in a trajectory over her head on two or three separate occasions," and "Andy allegedly reported that [Turner] 'discharge[d] a firearm in a trajectory over the truck he was driving.'" *Id.* (quoting Filing No. 1 at 8).  At the very least, these facts created "*arguable* probable cause for [Turner]'s arrest, and 'a reasonable officer could have mistakenly believed that probable cause existed,'" entitling the County Defendants to qualified immunity. *Id.* (emphasis in original) (quoting *D.Z. v. Buell*, 796 F.3d 749, 755 (7th Cir. 2015).

In response, Turner contends no arguable probable cause existed when "[a]rguably Turner's arrest was retaliatory in nature and without regard for the collective knowledge of the Washington

County Sheriff's Department that Cheryl and Andy's statements were false." ([Filing No. 29 at 21](#).)
The deputies left the property for "an extended time" after their initial visit—choosing not to
"mirandize, handcuff, arrest and transport Turner to the Washington County Sheriff's Department
for processing and detention—and returned "only after Turner attempted to complain about Deputy
Hein and Deputy Hildreth's investigation tactics." *Id.* at 22. And even before that, Deputy Hein's
probable cause belief was belied by the fact that "he and Deputy Hildreth clearly lacked faith in
Cheryl and Andy's statements because they interrogated Turner with hypothetical ricochet theories
(*see* [Filing No. 29-1 at 18](#)), which contradicts directly the Bakers' statements that they saw Turner
aim and/or point and/or discharge his pistols directly at them." ([Filing No. 29 at 22](#).) "Strikingly,"
Turner continues, "Deputy Hein and Deputy Hildreth elected not to remove and/or seize the very
pistols the Bakers claimed they spotted were being used by Turner against them." *Id.* Instead,
"they removed themselves from the situation," and only after Turner "complained about Deputy
Hein and Deputy Hildreth's investigatory tactics did Deputy Hein determine arrest was
appropriate." *Id.*

In reply, the County Defendants contend that the argument in Turner's response mirrors
that made in *Wilkerson v. Wright*, where a plaintiff who had been arrested by a crossing guard
challenged whether the guard could have reasonably relied on witness reports that contained
"significant inconsistencies." ([Filing No. 34 at 4](#) (citing Case No. 1:09-CV-1314-WTL-MJD, 2011
WL 847074, at *4 (S.D. Ind. Mar. 9, 2011)). The *Wilkerson* court, however, rejected this
contention, emphasizing that "'so long as a reasonably credible witness or victim informs the police
that someone has committed, or is committing, a crime, the officers have probable cause to place
the alleged culprit under arrest.'" *Id.* (citing *Wilkerson*, 2011 WL 847074, at *5). In fact, the court
held that an officer is not obliged "to weigh the evidence before filing his probable cause affidavit,

because a probable cause determination 'does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands.'" *Id.* (citing *Wilkerson*, 2011 WL 847074, at \*5). Any inconsistencies later discovered were deemed irrelevant, the court continued, because "the existence of probable cause turns on the information known to the officers at the moment the arrest is made." *Id.* (emphasis in original) (citing *Wilkerson*, 2011 WL 847074, at \*5) (underlining County Defendants'). Finally, any allegation of "retaliatory arrest should be disregarded" when it "was not sufficiently plead[ed] in the Complaint, and [ ] 'subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.'" *Id.* at 34 (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity, in this context, protects officers who reasonably but mistakenly believe that probable cause exists. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam). "Thus, when a defense of qualified immunity has been raised," the Seventh Circuit has explained, a court must ask "whether the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed." *D.Z.*, 796 F.3d at 755 (quotation omitted). In other words, a court must "ask whether the officer had 'arguable' probable cause." *Id.* (citation omitted). "An arrest without probable cause is a violation of a constitutional right, whereas an arrest without arguable probable cause is a violation of a 'clearly established' constitutional right." *Gutierrez*, 722 F.3d at 1008 (7th Cir. 2013) (citation omitted).

"Even if probable cause is lacking with respect to [an] arrest, despite the officers' subjective belief that they had probable cause, they are entitled to immunity as long as their belief was objectively reasonable." *Edwards v. Cabrera*, 58 F.3d 290, 293 (7th Cir.1995). As demonstrated above, *see supra* Section II.A.3.a, these County Defendants reasonably believed there was probable cause to arrest Turner when Deputy Hein obtained from the Bakers sworn accounts that Turner had discharged firearms at them, and Turner has tendered no reason for them to have called into question the truth of those claims. *See Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998) ("So long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause to place the alleged culprit under arrest, *and their actions will be cloaked with qualified immunity*.") (emphasis added). Even if there were no *actual* probable cause to arrest Turner, qualified immunity shields the County Defendants from suit because *arguable* probable cause existed to arrest him based on the facts and circumstances before them at the time of the arrest. For this reason, the Court alternatively **grants** the Motion to Dismiss on Turner's § 1983 claim against these County Defendants on qualified immunity grounds.

### c.    Section 1983 Claim Against Sheriff Miller

Finally, the County Defendants argue that Sheriff Miller is shielded from liability because "42 U.S.C. § 1983 'does not allow actions against individuals merely for their supervisory role of others.'"  (Filing No. 17 at 9 (quoting *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000))). Because "'[a]n individual cannot be held liable in a § 1983 action unless he caused or participated in [the] alleged constitutional deprivation,'" and Turner "cannot establish any underlying constitutional violation which would give rise to *Monell* liability in this case," his claims fail "as a matter of law." *Id.* (quoting *Zimmerman*, 226 F.3d at 574 and citing *Houskins v. Sheahan*, 549

20

F.3d 480, 493 (7th Cir. 2008)).  In response, Turner argues that he has sufficiently asserted a claim against Sheriff Miller by alleging "that he suffered a deprivation of a federally protected right, and the deprivation resulted from an official policy, custom, or practice." (Filing No. 29 at 23 (citing *Perkins v. Lawson*, 312 F.3d 872, 875 (7th Cir. 2002).)  Specifically, Turner "was deprived of [his] constitutional right to be free from a warrantless arrest without probable cause based upon Sheriff Miller['s] development and maintenance of policies, customs and training protocols." *Id.* (quotation omitted).

As Turner recognizes, "to state a claim against Sheriff Miller in his official capacity under § 1983, he must allege that he suffered a deprivation of a federally protected right." *Id.* (citing *Perkins*, 312 F.3d at 875).  Since both actual and arguable probable cause supported his arrest, *see supra* Sections II.A.3.a, II.A.3.b, Turner's § 1983 allegation against Sheriff Miller must fail.  For this reason, the Court **grants** the County Defendants' Motion to Dismiss on this claim.

A.    **The Bakers' Motion to Dismiss**

Turner brings three claims against the Bakers: defamation and libel per se, malicious prosecution, and intentional infliction of emotional distress.  (Filing No. 1 at 15–16.)  The Bakers, move to dismiss all the charges against them under Indiana's Strategic Lawsuit Against Public Participation Act (the "Anti-SLAPP Act") (*see* Filing No. 14).  Because the Bakers move to dismiss the case against them based on the Anti-SLAPP Act and attach material outside the pleadings (*see* Filing No. 15-1; Filing No. 15-2; Filing No. 15-3; Filing No. 15-4; Filing No. 15-5; Filing No. 15-6; Filing No. 15-7; Filing No. 15-8) in support, their Motion will be treated as a motion for summary judgment.  Indiana Code section 34-7-7-9 instructs that if an Anti-SLAPP motion to dismiss is filed, a court "shall . . . [t]reat the motion as a motion for summary judgment."

1.      **Additional Background**

Turner and the Bakers have lived next to one another since August 9, 1999 (Filing No. 15

at 2 (citing Filing No. 15-1 at 2; Filing No. 15-2 at 2). On multiple occasions over the years, a

neighbor alleged that, "[he] ha[s] witnessed [Turner] fire weapons as powerful as a .357 magnum

and possibly a 44-caliber pistol in his backyard in the direction of the Bakers' property." *Id.* at 3

(citing Filing No. 15-3 at 2).  On July 27, 2018, Turner was approximately one hundred feet away

from Cheryl as he fired in the direction of her home as she retrieved her mail.  *Id.* at 2 (citing Filing

No. 15-2 at 2).   After Cheryl returned to her home, Turner continued shooting for two-and-a-half

hours.  *Id.* (citing Filing No. 15-2 at 2).  Even when Andy—after arriving home from work and

seeing Turner watching him and hearing him discharge a firearm—warned Turner that he would

call the police if Turner fired another round, Turner kept shooting.  *Id.* (citing Filing No. 15-1 at

2).  Although Turner asserts that he fired his weapon into the ground, the "Bakers heard leaves on

the trees rustle after the shots and believed [Turner] was firing through the trees in the direction of

their property."  *Id.* at 3 (citing Filing No. 15-1 at 2; Filing No. 15-2 at 2).

Because a subdivision is on the other side of their property, the Bakers "were concerned

that bullets from [Turner]'s weapon would fly into the neighborhood injuring someone."  *Id.* (citing

Filing No. 15-1 at 3; Filing No. 15-2 at 3; Filing No. 15-3 at 2).  Indeed, the Bakers contend they

reported the shots to the Sheriff's Department "because of the concern for individuals potentially

being hurt when the bullets came down" and "did not want [Turner] arrested but simply for the

deputies to advise him of the perceived danger." *Id.* (citing Filing No. 15-1 at 3; Filing No. 15-2

at 3; Filing No. 15-4 at 2).  After Turner showed Deputies Hein and Hildreth where he shot his

guns, Deputy Hein later indicated that the location "was facing the Baker's residence and there

were only pine trees located at the edge of the yard."  *Id.* (citing Filing No. 15-8 at 4).  This,

according to Deputy Hein, "was not a safe backstop for Turner to shoot into." *Id.* (citing Filing No. 15-8 at 4).

Though Deputy Hein tried to discuss safe gun practices with him, Turner became agitated and advised the deputies to leave his property if he was not going to be arrested. *Id.* at 3–4 (citing Filing No. 15-8 at 4).  At this point, no arrest was made, and no firearms were confiscated. *Id.* at 4 (citing Filing No. 1 at 11).  Only after Turner "voluntarily and without request from officials[ ] went to the Washington County Sheriff's Department to further address the matter" was he arrested and charged with criminal recklessness. *Id.* (citing Filing No. 15-8 at 4; Filing No. 15-6 at 2). Ultimately, at the trial where Turner was found not guilty of the charge, neither of the Bakers were called as witnesses. *Id.* (citing Filing No.15-7 at 2; Filing No. 15-1 at 3; Filing No. 15-2 at 3).

   2.   **Analysis**

In their brief in support of their Motion to Dismiss, the Bakers argue that—in violation of the Anti-SLAPP Act—Turner's "lawsuit is clearly designed to punish the Bakers for contacting law enforcement to express their concerns and to protect themselves and the public from the dangerous and reckless discharge of weapons in a residential area."  (Filing No. 15 at 1–2.)  The Bakers note that the Anti-SLAPP Act is intended to defend against "meritless suits aimed at silencing a plaintiff's opponents, or at least diverting their resources." *Id.* at 5 (quoting *Konrath v. Vance*, No. 116CV02784LJMDKL, 2017 WL 1382778, at *4 (S.D. Ind. Apr. 18, 2017) (quotation omitted)).

 The Bakers contend the Anti-SLAPP Act bars Turner's claims against them because,  "the acts complained of are 'in furtherance of the person's right to petition or free speech under the Constitution of the United States or the Constitution of the State of Indiana in connection with a public issue," and "taken in good faith and with a reasonable basis in fact and law.'" *Id.* at 6–7

(quoting Ind. Code §§ 34-7-7-9(d)), -5).  Matters of public issue and interest are broad: "'Speech is a matter of public concern within the context of the Anti-SLAPP Act if it is addressed to any matter of political, social, or other concern to the community, as determined by its content, form, and context.'" *Id.* (quoting *Gresk Estate of VanWinkle v. Demetris*, 81 N.E.3d 645, 652 (Ind. Ct. App. 2017)). "Here, the Bakers' statements clearly express their concern not only for their personal safety but also for the safety of individuals in the nearby" neighborhood. *Id.* at 9.  Good faith, in this defamation context, "means 'a state of mind indicating honesty and lawfulness of purpose; belief in one's legal right; and belief that one's conduct is not unconscionable.'" *Id.* at 7 (quoting *Owens v. Schoenberger*, 681 N.E.2d 760, 764 (Ind. Ct. App. 1997)).  Here, again, "the Bakers' states of mind were such that the reporting was necessary for personal and public safety" when they believed, consistent with their prior experiences, that Turner was shooting guns into the air. *Id.* at 9, 10–11.  Moreover, Turner "was in fact firing his weapon in an unsafe manner" when Deputy Hein warned him that he did not have a safe backstop.  *Id.* at 11.  In fact, it is "reasonable to assume" that Turner was arrested "because he refused to accept that he was acting in an unsafe manner and would not agree to stop engaging in such activity"—not purely "because of the Bakers' statements."  *Id.* at 11–12.  As for the merits of his defamation claim, Turner cannot prevail when he cannot demonstrate that the Bakers' statements were made with "actual malice."  *Id.* at 8–9. Finally, the Bakers contend they should receive attorney's fees and costs because "'a defendant who prevails on a motion to dismiss under the anti-SLAPP Act is entitled to recover reasonable attorney's fees and costs.'"  *Id.* at 8 (quoting Ind. Code § 34-7-7-7).

In response, Turner reiterates many of the same facts concerning the land dispute that he conveyed in response to the County Defendants' Motion (*see* Filing No. 28 at 2–13; *supra* Section II.A.2).  He details the events of July 27, 2018 (*see* Filing No. 28 at 13–21).  After essentially

repeating the facts alleged in his Complaint and laying out the pertinent legal criteria, Turner argues that he "did not point, aim and/or discharge any of his pistols towards any person, in the direction of a person, or at a structure where people were known to frequent". *Id.* at 27. He explains that although the public may have an interest in the reckless discharge of weapons, any statements about that conduct "lose their luster when they are undeniably false," as Andy and Cheryl's were. *Id.* at 27.

Turner argues there is sufficient evidence that Andy and Chery's statements were "knowingly false" and "made with reckless disregard of the truth." *Id.* at 28. "First, and most importantly, it is clear from the video footage that [Turner] never fires any of his pistols in the direction of Cheryl." *Id.* Moreover, Cheryl's claim that "shots went off 'over' her as she started walking back toward the house down the driveway" are refuted by Turner's surveillance footage. *Id.* at 29. And she could not have seen Turner "turn and walk towards his house" unless she "stood in the vicinity of her mail box and peered through the dense tree line to watch him." *Id.* As for Andy's statements, Turner never "looked at" him driving by because he, as the footage shows, was "totally involved with the pistol he is holding." *Id.* at 30. And his assertion that he warned Turner to stop shooting must also be false as Andy's truck "never stops moving." *Id.* Moreover, Turner argues that he did "not discharge a pistol as Andy drives down Woodland Drive and turns onto his driveway"; instead, he was "most likely running the slide and trying to get it to eject or chamber rounds." *Id.* at 31. Turner contends the footage from his security camera "shows that Andy's statements that he personally observed Thomas point and/or aim and/or discharge a firearm at or in close proximity to him while he was driving his pickup was false because it just did not happen." *Id.* at 32. Finally, he asserts that Cheryl and Andy "acted with malice" when "Andy's goal of commandeering the Turners' property by being the bad neighbor that people move away from

entered uncharted territory—Cheryl and Andy filed knowingly false police reports against" Turner. *Id.* at 32–33. Because Cheryl and Andy could not have seen the actions they reported, Turner concludes, they "acted recklessly with regard to whether their statements to the Deputy Hein and Deputy Hildreth were true and correct." *Id.* at 34.

In summation, Turner argues the statements made by the Bakers "are not the type of commentary the Anti-SLAPP Act means to protect" when the Bakers "did not make the statements at issue: (a) in furtherance of their right of free speech in furtherance of public issue, (b) in good faith, and (c) lawfully." *Id.* Finally, because the Bakers' "Anti-SLAPP Motion to Dismiss was 'frivolous' or 'solely intended to cause unnecessary delay,'" the Court should award Turner attorney's fees and costs. *Id.* (quoting Ind. Code § 34-7-7-8).

In reply, the Bakers contend that Turner's response "corroborates and supports the Bakers' position that they were justified in calling the authorities to express their concern." (Filing No. 35 at 1.) Even viewing the surveillance footage in Turner's favor, the Bakers contend, he was unambiguously "firing a weapon in the direction of the Bakers' property." *Id.* As for what the Bakers did or did not see or hear—let alone what they felt or believed—Turner "cannot account for any period when they cannot be seen" on the footage. *Id.* at 2. Moreover, Deputy Hein's advisement that "bullets fired into the ground could ricochet through the trees toward the Bakers and their residence" further buttresses their belief that Turner was endangering them and others. *Id.* at 1–2. Turner's lawsuit, the Bakers argue, "is clearly designed to punish the Bakers for contacting law enforcement to express their concerns and to protect themselves and the public from the dangerous and reckless discharge of weapons," precisely "the type of action the Anti-SLAPP Act was intended to prevent." *Id.* at 6. Though Turner "argues that the video shows him firing into the ground, and thus the Bakers' statements that they believed he was firing into the air

26

were false," that "is not the test." *Id.* Instead, the question is "whether the Bakers acted in good faith and that they honestly believed Plaintiff was discharging his weapon in a dangerous manner when they reported the gunfire to law enforcement." *Id.* at 6–7.  Although Turner "is fixated on his belief that no bullets ricocheted," he "fails to recognize the danger of his actions shooting in the Bakers' direction," which "created a clear and reasonable safety concern for the Bakers such that they were within their rights to raise this concern for their safety and that of others with law enforcement." *Id.* at 8.  The Bakers argue that the only thing relevant to their good faith belief was that Turner "was in his backyard, firing in the direction of their property, and that [the Bakers] were concerned for their own safety and that of others." *Id.*

"Indiana adopted its anti-SLAPP statute in 1998 to address and reduce abusive SLAPP litigation." *Gresk*, 96 N.E.3d at 568.  When faced with an anti-SLAPP motion to dismiss, this Court must determine:

> (1) whether an action was "in furtherance of the person's right of petition or free speech;" and, (2) if so, whether the action was "in connection with a public issue." [Ind. Code] § 34–7–7–5(1). If both requirements are satisfied, the court then analyzes (3) whether the action was "taken in good faith and with a reasonable basis in law and fact." *Id.* § 34–7–7–5(2).

*Id.* at 569.  Though "SLAPPs can be difficult to identify," the Indiana Supreme Court has noted,

> SLAPP lawsuits target a wide variety of political activity, including 'reporting violations of law, writing to government officials, attending public hearings, testifying before government bodies, circulating petitions for signature, lobbying for legislation, campaigning in initiative or referendum elections, filing agency protests or appeals, being parties in law-reform lawsuits, and engaging in peaceful boycotts and demonstrations.'

*Id.* at 568 (citing *SLAPPs: Strategic Lawsuits Against Public Participation*, 7 Pace Envtl. L. Rev. 3, 5 (1989)).  In short, SLAPPs are generally aimed at "chilling" the rights of individuals expressing matters of civic import.  *Id.* at 568, 570.

Turner's suit against the Bakers is not a SLAPP lawsuit: their statements were not made "in connection with a public issue."  To be sure, the Bakers seemingly had a *personal* stake in reporting what they believed to be their endangerment; but they also try to append *public* significance to the matter by indicating their distress for a neighboring community (*see* Filing No. 15 at 9, 10 ("Here, the Bakers' statements clearly express their concern not only for their personal safety but also for the safety of individuals in the nearby [ ] subdivision. . . . The Bakers' communications involve conduct that could directly affect a large number of people, and the communications involved a topic of widespread public interest and concern: public safety.").  This, however, falls short of the definition of a SLAPP, suits that target matters "of political, social, or other concern to the community, as determined by its content, form, and context."  *Gresk*, 96 N.E.3d at 571 (quotations omitted).  Indeed, "public safety" generally is a matter of public interest—but the Bakers' statements, merely concerning the conduct of one individual, are more limited in their reach.  As the *Gresk* court noted, for example, "[w]hile child abuse in certain instances may be an issue of public interest, it is not in this case.  Here, the . . .  report was . . . specific to one minor," and so its content was not the target of a SLAPP lawsuit.  *Id.; see also Britt Interactive LLC v. A3 Media LLC*, No. 1:16-cv-2884-TWP-DML, 2017 WL 2118513, at *7 (S.D. Ind. May 16, 2017) ("While the Magazines may be of general interest to members of their respective communities, statements and lawsuits relating to the ownership of the Magazines and the intellectual property associated with the Magazines are not matters of public interest."); *Kadambi v. Express Scripts, Inc.*, 86 F. Supp. 3d 900, 908–09 (N.D. Ind. 2015) ("While defendants assert a broad public interest in pharmaceutical services—which this Court does not doubt—the actual statements at issue here are significantly more narrow in scope. Instead, the statements at issue were several explanations, each to a single patient, regarding why a single prescription could not be filled.").  Simply put, "the

content, form, and context" of the statements made to the Sheriff's Department do not implicate the protected activity contemplated by Indiana's Anti-SLAPP legislation.  That said, the Court does not find the Bakers' motion "frivolous" or "solely intended to cause unnecessary delay," *see* Ind. Code § 34-7-7-8, so it does not award Turner attorney's fees and costs to answer it.

Because the Indiana Anti-SLAPP Act does not apply to this case, the Court **denies** the Bakers' Motion to Dismiss (Filing No. 14), and these state law claims may proceed. However, with the exception noted in the conclusion below, the Court intends decline to exercise supplemental jurisdiction over—and will relinquish jurisdiction over these state-law claims involving the Bakers. Needless decisions of state law should be avoided in federal court, "both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) (internal footnotes omitted); *see also Cortezano v. Salin Bank & Tr. Co.*, 680 F.3d 936, 941 (7th Cir. 2012) (because generally after "a court has dismissed all the federal claims in a lawsuit before trial, it should relinquish jurisdiction over supplemental state law claims rather than resolve them on the merits.") (citations omitted).

## B.   CONCLUSION

For the reasons explained above, the Motion to Dismiss filed by the County Defendants (Filing No. 16) is **GRANTED**, and all claims against them are **DISMISSED without prejudice**.[3] However, Turner shall have until February 25 to file  an amended complaint to address deficiencies concerning the County Defendants, if such a filing is not an exercise in futility.

---

[3] "[A] plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015). Unless it is certain from the face of the complaint that any amendment would be futile or otherwise unwarranted, the district court should grant leave to amend after granting a motion to dismiss." *Barry Aviation Inc. v. Land O'Lakes Municipal Airport Comm'n*, 377 F.3d 682, 687 & n. 3 (7th Cir. 2004).

The Motion to Dismiss filed by the Bakers pursuant to Indiana's Anti-SLAPP Act (Filing No. 14), is **DENIED**.  If, however, Turner does not file an amended complaint concerning the §1983 federal claims by **February 25, 2021**, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims, and they will be dismissed without prejudice so that Taylor can pursue them in state court.

      **SO ORDERED.**

Date:  2/4/2021

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Mark John Pizur
mark.pizur@hotmail.com

J. Clayton Culotta
CULOTTA & CULOTTA LLP
clay@culottalaw.com

Curtis Matthew Graham
FREEMAN MATHIS & GARY, LLP
cgraham@fmglaw.com

Casey C. Stansbury
FREEMAN MATHIS & GARY, LLP
cstansbury@fmglaw.com